UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOHN DOE, ) | CASE NO. |
| ) | |
| Plaintiff, ) | |
| v. ) | **VERIFIED COMPLAINT** |
| ) | |
| LOUISIANA STATE UNIVERSITY ) | **(JURY TRIAL DEMANDED)** |
| c/o Thomas C. Galligan, Jr., Interim President ) | |
| Office of the President ) | |
| Louisiana State University ) | |
| 3810 W. Lakeshore Dr. ) | |
| Baton Rouge, LA 70809 ) | |
| ) | |
| and ) | |
| ) | |
| THOMAS C. GALLIGAN, JR., in his official ) | |
| capacity as Interim President of Louisiana State ) | |
| University ) | |
| Office of the President ) | |
| Louisiana State University ) | |
| 3810 W. Lakeshore Dr. ) | |
| Baton Rouge, LA 70809 ) | |
| ) | |
| Defendants. ) | |

Plaintiff John Doe[1] ("John") for his Verified Complaint against Defendants Louisiana State

University and Thomas C. Galligan, Jr., states as follows:

## INTRODUCTION

1.     This action concerns the unjust and discriminatory decision of Louisiana State

University ("LSU") to suspend John for at least one year for alleged non-consensual sexual

intercourse following a biased, flawed, confusing, and unlawful process.

---

[1] Simultaneous to the filing of this Complaint, John Doe is filing a Motion to Proceed under Pseudonym and for
Protective Order in order to protect the identities of all students referenced in the pleadings and exhibits.

2.      On February 4, 2020 LSU informed John it was investigating an allegation that he engaged in non-consensual sexual intercourse. The notice did not identify the complainant, provide a location where the alleged incident occurred, or provide any details describing the alleged conduct that formed the basis of the investigation.

3.      Throughout the investigation and adjudication process, John's constitutional rights were violated. He was given no access to the evidence against him until after his guilt was already determined, and he was denied his right to confront and cross-examine his accuser and other witnesses.

4.      As set forth more fully below, LSU's biased, unfair, incomprehensible, and prejudicial system led to John being suspended from LSU for at least one year, which in turn led to his removal from the football team and subsequent loss of his full athletic scholarship.

5.      LSU consistently placed the burden on John to understand and follow its incomprehensible policies and held his failure to understand them against him, all the while LSU went out of its way to explain the process in detail to Complainant Jane Roe ("Jane") and her parents, more than once.

6.      LSU's process violated Title IX by discriminating against John on the basis of his sex, violated John's due process rights, and was in breach of its contractual obligations.

## PARTIES

7.      John, until his unlawful suspension, was an undergraduate student in good standing at LSU.  He is a resident of Alabama.

8.      John is an exceptionally talented football player and was recruited by LSU to play for its team.

9.      LSU is a public university located in Baton Rouge, Louisiana.

2

10.     Upon information and belief, Thomas C. Galligan, Jr. is the Interim President of LSU and a resident of Louisiana.

11.     Mr. Galligan has the authority to grant the injunctive relief sought in this Complaint.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action: (i) under 28 U.S.C. §§ 1331 and 1343 because this action arises, in part, under the laws of the United States—Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. §§ 1681 *et seq.*; and (ii) pursuant to the principles of supplemental jurisdiction under 27 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Mr. Galligan as he is domiciled in Louisiana.

14.     This Court is authorized to grant the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## BACKGROUND FACTS

### Title IX Enforcement

16.     On April 11, 2011, The United States Department of Education's ("USDOE") Office of Civil Rights ("OCR") issued its now infamous "Dear Colleague Letter," which instructed universities on how to investigate and resolve complaints of sexual misconduct under Title IX, the statute that forbids discrimination on the basis of sex by institutions that accept federal funding ("Dear Colleague Letter" available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html).

17.    Educational institutions designed to educate America's youth are ill-equipped to adjudicate allegations of sexual assault, remain wary of bad publicity, and continue to overreact to the threat of federal investigations, sanctions, and lawsuits, in part by discriminating against men on the basis of their sex.

18.    As colleges and universities like LSU become quasi-criminal investigators, they institutionalize unfair procedures that lead to unfair and unreasonable punishments of students accused of misconduct.

19.    OCR has warned schools to provide basic procedural protections to students, instructing that grievance procedures must provide "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence," and "equitable grievance procedures," and that "serving as the Title IX coordinator and a disciplinary hearing board member … may create a conflict of interest." *See* Dear Colleague Ltr.

20.    In a 2016 enforcement letter, OCR determined that Wesley College violated Title IX regulations when the school imposed interim disciplinary measures on an accused student without even speaking with him or attempting to understand his view. *See* Ltr. of Beth Gellman-Beer, OCR Supervisory Attorney to Wesley College (Oct. 12, 2016) (*available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03152329-a.pdf)    (not appropriate to impose an interim suspension on the same day an incident was reported, without interviewing the accused student or providing him with an opportunity to challenge the evidence or explain why the proposed suspension was unjustified: "a sufficient level of inquiry – that is not here evident – must be taken in determining the appropriateness of interim suspensions.").

21.     Further, in 2017, in interim guidance issued after rescinding the Dear Colleague Letter,[2] OCR "cautioned" schools "to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication." Q&A on Campus Sexual Misconduct, Sept. 22, 2017, at 5 (available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf).

22.     OCR advised that written notice of any allegations should be provided to an accused "with sufficient time to prepare a response before any initial interview" and that parties subsequently "should have the opportunity to respond to [a] report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility." *Id.* at 4-5.

23.     OCR instructs schools to "maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings." *Id.* at 5.

24.     Further, the new Title IX regulations that take effect on August 14, 2020, expressly require live cross-examination and make clear the Department of Education's position on due process as a requisite part of all university grievance processes. *See* Title IX Regulations Addressing Sexual Harassment (Unofficial Copy) (available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf); ("[f]or institutions of higher education, the recipient's grievance procedure must provide for a live hearing" and "[a]t the hearing, the decision-maker must permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility"; "[s]uch cross-examination at a hearing must be conducted by the party's advisor of choice."). *Id.* at p. 1138, *et. seq.*

---

[2] Even though USDOE formally rescinded the 2011 Dear Colleague Letter on September 22, 2017, schools continue to enforce the policies and procedures instituted in response to it.

25.     Under the new regulations all university grievance processes must "[p]rovide both parties an equal opportunity to inspect and review evidence … including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation." *Id.* at pp. 1500-1501.

26.     Universities will be required to "[c]reate an investigative report that fairly summarizes relevant evidence and, at least ten days prior to a hearing … provide a copy of the report to the parties for their review and written response." *Id.* at pp. 1033-1044.; ("these requirements will facilitate each party's ability to identify evidence that supports their position and emphasize such evidence in their arguments to the decision-maker."). *Id*.

27.     The new regulations also require that the "decisionmaker(s) … cannot be the same person(s) as the Title IX Coordinator or the investigator(s)." *Id.* at p. 99.

### LSU's Incomprehensible Student Policies

28.     In accordance with Title IX, LSU has adopted certain policies and procedures for the investigation and adjudication of alleged sexual misconduct.

29.     Specifically, LSU has adopted Permanent Memorandum 73 Title IX and Sexual Misconduct Policy ("PM-73") and the Code of Student Conduct ("Code"). A copy of PM-73 is attached as Exhibit 1 and a copy of the Code is attached as Exhibit 2.

30.     PM-73 purportedly supersedes any potentially conflicting provision elsewhere in LSU's Code.  However, both PM-73 and the Code contain vague language and undefined terms, leaving any reasonable student unsure as to what his rights are.

31.     Mr. Galligan, as LSU's Interim President, is responsible for designating the Title IX Coordinator who is responsible for the implementation, enforcement, and coordination of Title IX and any applicable university policy thereof.

## The Process Under PM-73

32.     Upon receiving notice of a complaint, the Campus Title IX Coordinator or his designee must conduct an initial review of the complaint.

33.     If the Campus Title IX Coordinator finds that a university policy may have been violated, an investigation shall be conducted.

34.     Both the charging student and the accused student are to be given opportunities to identify witnesses who may be interviewed and any evidence that should be considered.

35.     The investigator must compose a written investigative summary that includes a timeline of events, facts, and circumstances surrounding the complaint.

36.     Following completion of an investigative summary, the Campus Title IX coordinator, in consultation with various other LSU parties, will reach a finding based on a preponderance of the evidence as to whether the policy was violated.

37.     If there is a finding that it is more likely than not that a policy has been violated, PM-73 includes both an informal resolution procedure and a formal resolution procedure.

38.     The formal resolution procedure is used when either the charging party or the accused student have not consented to the informal resolution procedure, or when the informal resolution procedure is inappropriate.

39.     The parties are to be notified in writing as to the "date, time, and location of the formal resolution process."

40.    PM-73 is completely vague as to whether the formal resolution process is or includes a hearing and, if so, whether an accused student has any right to attend.

41.    The formal procedure consists of a formal review of all allegations, the initial complaint, supporting documents, investigative summary, and corresponding documents.

42.    For complaints involving students as respondents, the formal procedure will also consist of a panel of trained hearing officers, a similarly vague and undefined phrase.

43.    Following the outcome of the formal resolution process, a student has ten (10) days in which to appeal the outcome to the Campus Title IX Coordinator.

**Accountability Meetings**

44.    An entirely separate LSU policy, which is unclear as to how it coexists with PM-73, notes that upon receiving information to support an alleged violation, the Associate Dean of Students will assign a hearing officer, who will schedule an accountability meeting.

45.    Students are asked to prepare a written statement for the accountability meeting, which may be prepared in advance.

46.    At the accountability meeting, the charged student will be asked to share information about the incident.

47.    Following the accountability meeting, the hearing officer decides whether, by a preponderance of the evidence, the student is Responsible or Not Responsible.

48.    Upon a finding of responsibility, the hearing officer will issue an accountability outcome.

49.    If the student does not accept the administrative decision and accountability outcome, the student then has the option of requesting that the charge be heard by a University Hearing Panel ("UHP").

50.    The university official who participated in an investigation or Accountability Meeting may participate in a UHP as a Material Observer, essentially a witness.

51.    At a UHP, the policy claims that the panel must make a decision based solely on information presented at the hearing. However, it is unclear how the policy ensures that the official who participated in the underlying investigation or Accountability Meeting is prevented from introducing additional information.

52.    A majority vote of panel members is required to find a student Responsible for violation of the LSU Code.

**<u>Student Rights</u>**

53.    LSU purports to give an accused student the following rights:

- The right to receive a Notification Letter through Written Communication of any specific allegation and Charge;
- The right to be provided a reasonable amount of time to respond to the Notification Letter;
- The right to refuse to comment or answer questions;
- The right to present information and/or any Material Observer;
- The right to have any Charge considered by a UHP;
- The right to schedule a time prior to the UHP hearing to inspect and review the information on which a Charge is based;
- The right to have an Accountability Outcome imposed that is commensurate with the violation;
- The right to have an Advisor present during an Accountability meeting;
- The right to receive a list of all Material Observers to be called by the University at least one business day prior to a UHP. However, a UHP may continue the proceedings to allow the University to identify any Material Observer to rebut any information presented by the Charged Student; and
- The right to retain rights as a Student while the charges are being considered, and, if found Responsible, until the Student or RSO has exhausted all rights of appeal as established in this Code. However, a Student or RSO may be subject to an Interim Suspension, limitations or conditions as set forth in this Code

54.    The way that LSU's disciplinary process is structured means that an accused student only has the right to inspect and review the information and evidence against him only

9

*after*: (i) a Campus Title IX Coordinator has determined a policy may have been violated; (ii) the investigative summary has been drafted (which may well contain inaccuracies that cannot be corrected or addressed until long after the fact); (iii) the Title IX Coordinator decides whether, by a preponderance of the evidence that a violation likely occurred; (iv) a formal resolution process, has concluded; and (v) a student files an appeal.

55.    Under LSU's disciplinary process, a student may never be able to review the evidence against him until after important decisions with precedential value have been made.

**<u>The Events of January 23 and January 24, 2020</u>**

56.    Sometime after 10:30 p.m. the evening of January 23, 2020, John and a friend went to Tigerland.

57.    Tigerland is approximately one mile from LSU's campus and is a cluster of four bars and/or nightclubs.

58.    John and his friend parked in the parking lot of Fred's Bar & Grill's and walked to The House in Tigerland ("House").

59.    At some point, John saw Jane at House.

60.    John and Jane engaged in conversation with one another.

61.    Later in the evening, John asked Jane if she wanted to have sexual intercourse and she agreed.

62.    John and Jane left House and engaged in sexual intercourse.

63.    Thereafter, John accompanied Jane back to her dorm.

64.    When they arrived at Jane's dorm, John asked Jane if she wanted him to walk her to her dorm, to which Jane said "no" and that "she was fine."

65.    John did not see Jane again after this evening.

**John Becomes Aware of a Complaint Against Him, But Receives No Details and is Not Permitted to Review the Evidence or Statements Against Him**

66.    On February 4, 2020 LSU informed John it was investigating an allegation that he engaged in non-consensual sexual intercourse. The notice did not identify the complainant, provide a location where the alleged incident occurred or provide any details describing the alleged conduct that formed the basis of the investigation.

67.    The notice violated John's rights pursuant to LSU policy that an accused student has a right to know the specific allegations against him.

68.    John became aware of the complaint on February 6, 2020, when football coach Ed Orgeron informed him.

69.    Coach Orgeron informed John that while he did not know anything about the complaint, John would have to be suspended from the football team until the matter was resolved.

70.    Coach Orgeron referred John to Miriam Segar, LSU's Senior Associate Athletics Director, for more information.

71.    John met with Ms. Segar later that same day. Ms. Segar was the individual who informed John of the basic details surrounding the complaint, including that a claim had been made that he had had non-consensual sex with a female individual on January 23, 2020.

72.    Ms. Segar informed John that, while he could still attend classes, he could not be associated with the football team while the matter was ongoing.

73.    Ms. Segar referred John to Jeffrey Scott, LSU's Title IX lead Investigator.

74.    On February 19, 2020, John and his father met with Mr. Scott to discuss the complaint.

75.    Mr. Scott advised John that this was not a criminal matter, the police would not be involved, and that there would not be an arrest.

11

76.    Mr. Scott failed to inform John that the police in fact were contacted the night of the incident, specifically both the LSU Police Department and the Baton Rouge Police Department, which John did not learn until months later.

77.    Mr. Scott informed John that the investigation would be completed by February 29, 2020.

78.    However, the investigation was not complete by February 29, 2020. John attempted to reach out to Mr. Scott numerous times, but Mr. Scott was unresponsive. John left Mr. Scott several voicemails.

79.    John reached out to Mr. Scott on March 2, 2020, inquiring as to the status of the investigation.

80.    Mr. Scott informed John that the investigation had been delayed multiple times, though John was not informed at that time as to the reason for the delays.

**LSU Unjustly Finds John Responsible**

81.    It was not until March 6, 2020, that John became aware of the results of the investigation.

82.    On March 6, 2020, John learned that the investigation had been concluded and determined that John was responsible for the policy violation, even as John was never made aware what evidence or witnesses existed against him.

83.    March 6, 2020 was the first time that John was able to review the evidence and witnesses against him.

84.    The investigative report found John responsible despite clear inconsistencies in John and Jane's accounts, including that Jane claimed that she vomited twice while with John on

the way back to her dorm, but John has stated that Jane did not vomit or otherwise give any indication of intoxication.

85.    The investigative report also emphasized PM-73's definition of consent, including that "Silence alone, without actions evidencing permission, does not demonstrate consent." In finding John responsible, the investigate report failed to reference the fact that Jane in fact gave affirmative consent by answering "yes" when John asked if she wanted to have sexual intercourse, and further that her actions evidenced permission, such as by Jane removing her own clothes.

## Jane Doe Received Preferential Treatment

86.    John later learned that while Mr. Scott was unresponsive to John's communications to attempt to learn more about the investigation, LSU was in frequent communication with Jane.

87.    Specifically, John became aware that on January 29, 2020, Mr. Scott and Jennie Stewart, LSU's Title IX and ADA Coordinator, had a phone call with Jane Doe's *parents* to explain the Title IX process and reporting options.

88.    Ms. Stewart then met with Jane on January 31, 2020 to explain the process even further, during which Jane agreed to move forward with the Title IX process.

89.    Upon information and belief, Jane was in regular contact the Title IX and ADA Coordinator and Title IX investigators/staff who worked with Jane through the process.

90.    In contrast, John's frequent requests for information were ignored and his suspension from football was in place for well over a month as the investigation was needlessly delayed.

91.    LSU later blamed John for his failures to abide by the nuances of LSU policy, but John was doomed from the start given that the process was never explained to him in the specific and detailed manner as it was to Jane.

13

92.     Mr. Scott later informed John's family that the investigation was delayed because Mr. Scott had "other things to do," doubtlessly including the fact that LSU was occupied with catering to Jane.

**John Attempts to Appeal, But LSU Fails to Abide By its Own Policies**

93.     Upon receiving the investigative report, the letter purported to give John 10 days to submit an appeal for a formal resolution process.

94.     This is inconsistent with PM-73, which, though incomprehensibly vague, appears to guarantee that after it is determined that a violation of university policy more than likely occurred, the resolution process is the natural next step.

95.     LSU instead placed the burden on John to submit an appeal and make sure the process continued to move forward.

96.     Moreover, LSU's insistence on a prompt response is highly questionable, given that on March 11, 2020, Louisiana Governor John Bel Edwards declared a statewide public health emergency due to COVID-19 and suspended legal deadlines. *See* Proclamation Number 25 JBE 2020; Proclamation Number 30 JBE 2020; Proclamation Number 41 JBE 2020.

97.     All proceedings and deadlines applicable to proceedings in courts, administrative agencies, and boards remained suspended until May 15, 2020. *See* Proclamation Number 52 JBE 2020.

98.     Despite Governor Edwards's declaration, LSU continued with John's proceeding.

99.     John timely submitted an appeal on March 18, 2020. His appeal was assigned to Ms. Stewart.

100.    Ms. Stewart never spoke with or attempted to speak with John.

101.    On April 2, 2020, Ms. Stewart sent John a letter reaffirming that he had more likely than not violated PM-73 and that the appellate process was thereby concluded.

102.    LSU violated its own rules established by PM-73, which requires that parties must be notified in writing as to the time, date, and location of the formal resolution process.

103.    Ms. Stewart's letter purported to forward John's case to the Student Advocacy and Accountability office for adjudication of sanctions.

104.    It is unclear how LSU commingled the standards set by PM-73 and those regarding Accountability Meetings given that LSU policy dictates that Accountability Meetings serve to determine whether or not a student is Responsible, which already occurred in John's case.

105.    Instead, LSU appeared to utilize the Accountability Meeting only to determine a proper sanction, in violation of its own policy and completely disregarding its responsibility to make a responsibility determination.

106.    On April 17, 2020, Associate Dean of Students & Director Jonathan Sanders emailed John a letter requesting an Accountability Meeting to occur via Zoom on April 23, 2020.

107.    The letter reiterated supposed LSU policy and specifically stated that during the meeting, John would have the opportunity to share information regarding the incident.

108.    John had class on April 23, 2020, so the meeting was rescheduled for April 24, 2020.

109.    Rather than giving John an opportunity to explain his side of the story, Dr. Sanders instead only asked personal questions relating to John's future and his goals.

110.    The complaint, underlying incident, and investigation, including LSU's acceptance of Jane's story over John's, were only discussed in the Accountability Meeting when John himself brought it up in discussion.

111.    On May 1, 2020, the outcome letter was sent to John via email, claiming to uphold the finding of Responsibility and the one-year suspension from LSU, even though the meeting contained very little discussion about the case.

112.    Days later, on May 6, 2020, John's mother received a phone call from Wide Receivers Coach/Assistant Head Coach Mickey Joseph, informing her of the decision against having John rejoin the team next season.

113.    Coach Joseph encouraged John's family to reach out if John wished to play football for another school.

114.    John's father reached out to Coach Joseph the next day, who advised that he was not certain as to the reason for John's dismissal, but thought it could be due to Title IX.

**LSU Agrees to Rehear John's Case, Then Impermissibly Revokes Its Offer**

115.    Though the outcome letter was sent to John on May 1, 2020, John did not become fully aware of the actions required by the letter until May 8, 2020.

116.    The letter stated that John was subject to a one-year suspension effective as of May 10, 2020.

117.    At that time, John was attempting to navigate the stress of ongoing exams while coping with the fallout of being let go from the team.

118.    The letter purported to give John three business days to respond and accept or decline the outcome.

119.    The letter improperly placed the burden on John to take affirmative action to prevent his suspension from taking effect.

120.    Once realizing the gravity of what the letter required, on May 8, 2020 John promptly contacted Ms. Segar.

121.    Ms. Segar informed John he was entitled to three business days from the date the letter was opened to respond and accept LSU's offer to have an appeal.

122.    On May 12, 2020, John notified Dr. Sanders that he was exercising his right to decline the outcome of the accountability meeting and accepting LSU's offer to have John's case reheard by a UHP.

123.    LSU acknowledged John's acceptance of a UHP on that same day. LSU's acceptance is attached as Exhibit 3.

124.    John's sanction was stayed as a result of his UHP request and LSU permitted him to enroll in an intersession online course.

125.    John virtually attended the class starting on May 19, 2020, and completed the class on May 30, 2020, the date of the class's final exam.

126.    Suddenly, on June 4, 2020, John was notified that LSU was rescinding its offer to hold a UHP on the basis that John's acceptance was untimely, notwithstanding Proclamation Number 52 JBE 2020, which suspended deadlines through May 15, 2020.  LSU's unilateral revocation is attached as Exhibit 4.

127.    LSU violated its policy in that a right supposedly given to its students includes a right to have any university charge reviewed by a UHP.

128.    John's suspension was reinstated.

129.    LSU again blamed John for his failure to abide by their convoluted and incomprehensible policies even as the process was never explained to him as it was to Jane and her family.

### John Finally is Able to Review the Complaint Documents that Contain Previously Unheard Evidence and Clear Mistakes

130.    In mid-May, 2020, John also retained the undersigned counsel, who requested complete copies of John's education record, including disciplinary files.

131.    Included in the records produced by LSU were documents that John and his family had never reviewed or been aware of, including a police report, despite Mr. Scott's assurances that the police were not involved in the matter.

132.    The records also revealed to John the extent to which LSU gave Jane preferential treatment, including its numerous calls with not only Jane, but specifically to Jane's parents to discuss the process.

133.    Further, upon review, it became apparent that LSU's documents regarding the complaint included blatant mistakes, such as an incorrect date of the incident that gave rise to the complaint.

### Irreparable Harm

134.    LSU failed to comply with bare minimum process requirements and even its own established, albeit confusing and nonsensical, policies.

135.    LSU improperly placed the burden on John to commence the formal resolution process and failed to inform him of the date, time, and location of the formal resolution process, in violation of LSU policy.

136.    LSU failed to provide John with an opportunity to review the evidence or witnesses against him until after LSU considered him responsible.

137.    LSU needlessly prolonged the investigation to accommodate Mr. Scott's schedule, even though John could not rejoin the football team until the matter was resolved.

138.    In regularly ignoring John's attempts to communicate regarding the investigation while meeting with Jane and her family multiple times to walk them through the process, LSU, under Mr. Galligan's direction, gave Jane preferential treatment.

139.    As a result of LSU's actions, John is facing a one year suspension, the loss of his spot on the football team, the loss of his full athletic scholarship, and the prospect of his future professional athletic career being permanently derailed

**CLAIM ONE**
**Violation of Title IX**
**(Against Defendant LSU)**

140.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

141.    Title IX, 20 U.S.C. §§ 1681 *et seq.*, provides, in relevant part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

142.    LSU has waived its right to Eleventh Amendment sovereign immunity by accepting federal funds under Title IX. *See Pederson v. Louisiana State Univ.*, 213 F.3d 858, 875 (5th Cir. 2000).

143.    Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

144.    Title IX may be violated by an institution of higher education's imposition of discipline where gender is a motivating factor in the decision to discipline.

145.    Challenges to the disciplinary proceedings of institutions of higher education generally fall into two categories: (1) erroneous outcome, where plaintiff is innocent and

wrongfully found responsible with gender bias a motivating factor; and (2) selective enforcement, where regardless of the guilt or innocence, the severity of the penalty or decision was motivated by a gender bias.

146.    An erroneous outcome occurred in John's case because he was found responsible for non-consensual sexual intercourse, and gender bias was a motivating factor in the decision.

147.    The denial of due process and procedural errors made in John's case resulted in the erroneous outcome based on a flawed and distorted conception of the facts.

148.    LSU failed to conduct an adequate, reliable and impartial investigation. The investigation was conducted in a manner biased against John and in favor of Jane's version of events. He did not receive meaningful notice or access to material information necessary to meaningfully participate in the process.

149.    LSU also selectively enforced stringent disciplinary actions against John and deprived him of his rights under the process because he is a man, while Jane was entitled to greater deference and credibility because she is a woman.

150.    As a direct and proximate result of LSU's conduct, John sustained tremendous damages, including, but not limited to, loss of his place on the football team, loss of a full athletic scholarship, emotional distress, loss of education and career opportunities, economic injuries and other direct and consequential damages.

**CLAIM TWO**
**42 U.S.C. § 1983, Denial of Fourteenth Amendment Due Process**
**(Against Defendant Mr. Galligan)**

151.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

152.    42 U.S.C. § 1983 provides in pertinent part that every person who subjects any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law or suit in equity.

153.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty or property, without due process of law."

154.    In this case, Mr. Galligan is a state actor subject to the Fourteenth Amendment and his status does not immunize him from suits seeking injunctive relief from his acts that violate a person's constitutional rights. *See Johnson v. Louisiana*, No. 01-2002, 2002 U.S. Dist. LEXIS 1284 at *16 (E.D. La. Jan. 18, 2002). Mr. Galligan, as LSU's Interim President, is responsible for designating the Title IX Coordinator who is responsible for the implementation, enforcement, and coordination of Title IX and any applicable university policy thereof

155.    A person has a protected liberty interest in his good name, reputation, honor, and integrity that he cannot be deprived of without due process.

156.    It is well-known that a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property. A student facing expulsion or suspension from a public educational institution is entitled to the protections of due process.

157.    Due process requires, at minimum, notice and some opportunity for hearing.

158.    LSU violated John's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness, including his right to a fair adjudication, his right to be informed of the charges against him, his right to be heard by an impartial fact finder, his right to

question his accuser, his right to challenge the credibility of any adverse witnesses, and his right to present evidence and witnesses in support of his defense.

159.    Cross-examination is required for basic due process in a campus disciplinary proceeding. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 404 (6th Cir. 2017). Yet, in John's case where LSU relied upon a credibility assessment determined by an investigator that John had minimal contact with, there was no hearing, no sworn testimony, and no cross-examination available in violation of due process of law.

160.    LSU, under Mr. Galligan's direction, failed to provide John with basic due process protections as required by the Fourteenth Amendment.

161.    As a direct and proximate result of these due process violations, John continues to suffer ongoing harm, including damage to his reputation, loss of educational and career opportunities, economic injuries and other non-economic damages.

## CLAIM THREE
### Breach of Contract
### (Against LSU)

162.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

163.    LSU waived any immunity they may be entitled to because its offering of a UHP is inextricably tied to its receipt of federal funds under Title IX, through which it also waives Title IX immunity. LSU further waived immunity by extending John an offer on May 1, 2020 to hold a UHP.

164.    John accepted LSU's offer on May 12, 2020. *See* Exhibit 3.

165.    LSU acknowledged John's acceptance later that same day.

166.    LSU then unilaterally and impermissibly revoked its offer on June 4, 2020 and refused to hold a UHP despite its contractual obligation. *See* Exhibit 4.

167.    In wrongfully revoking its offer after John accepted it, LSU violated the implied covenant of good faith and fair dealing.

168.    John incurred damages because, following LSU's revocation, his sanction was reinstated.

169.    As a direct and proximate result of these due process violations, John continues to suffer ongoing harm, including damage to his reputation, loss of educational and career opportunities, economic injuries and other non-economic damages.

**WHEREFORE,** John respectfully requests that this Court:

(A)    Enter injunctive relief that vacates the decision of LSU to deny John the right to a UHP and to dismiss John for at least one year, reinstates him as a member of the LSU football team, restores his full athletic scholarship, and removes from his academic record all references to the decision and any other related sanctions or disciplinary actions;

(B)    Issue a declaration that LSU's process is unlawful; and

(C)    Award such other relief as this Court may deem just and proper.

Respectfully Submitted,

*/s/ John S. McLindon*
**John S. McLindon (La Bar Roll No. 19703)**
**Brant M. Mayer    (La Bar Roll No. 36569)**
12345 Perkins Road, Building 2-Suite 202
Baton Rouge, LA 70810
P: (225) 408-0362
F: (877) 241-2631
E: mclindon@lawbr.net

**Susan C. Stone\*  (Ohio Atty R. No. 0064445)**
**Kristina W. Supler\* (Ohio Atty R. No. 0080609)**
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com

*\*Motion to Admit Pro Hac Vice pending*
*Counsel for Plaintiff John Doe*

## JURY DEMAND

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 39.

*/s/ John S. McLindon*
John S. McLindon