UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOHN DOE** | **CIVIL ACTION** |
| **VERSUS** | |
| **LOUISIANA STATE UNIVERSITY, ET AL.** | **NO.:20-00379-BAJ-SDJ** |

### RULING AND ORDER

Before the Court is Plaintiff's **Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 3)**. Plaintiff asks the Court to order Defendants, Louisiana State University ("LSU") and interim President Thomas Galligan, to provide him a hearing before the University Hearing Panel ("UHP") and to lift the sanctions placed on him pending the outcome of the UPH decision. Defendants filed an opposition to the Motion (Doc. 17). For the reasons stated herein, Plaintiff's Motion is **DENIED**.

### I. BACKGROUND

Plaintiff John Doe, a student-athlete at LSU, alleges that on February 4, 2020, he was informed by Defendants that another student, identified herein as "Jane Roe," filed a report accusing him of sexual misconduct.[1] On February 19, 2020, Plaintiff met with Jeff Scott, LSU's Title IX Lead Investigator, who interviewed him regarding the events described in the report. On March 6, 2020, Plaintiff was notified, in

---

[1] Due to the nature of the underlying allegations, Plaintiff filed a motion asking to proceed with this lawsuit using the "John Doe" pseudonym. (Doc 2). His motion was granted. (Doc. 19).

1

writing, that Scott found him responsible for the sexual misconduct alleged by Jane Roe. Defendants advised Plaintiff that he could appeal Scott's decision to the Title IX Coordinator, Jennie Stewart. Plaintiff timely appealed, and following a review, the Title IX Coordinator later upheld Scott's findings. Defendants then notified Plaintiff that he was entitled to attend a meeting with Jonathan Sanders, Director of Student Advocacy and Accountability, to further discuss the report and decisions. Plaintiff attended this meeting.

On May 1, 2020, Defendants notified Plaintiff by letter that they found him responsible for the sexual misconduct reported by Jane Roe and that he would be suspended from LSU for a period of one year. In the letter, Defendants also offered Plaintiff the opportunity to request a University Panel Hearing ("UHP") review within three days of his receipt of the letter. Plaintiff requested the UHP review on May 12, 2020, several days past the three-day deadline. (Doc. 23 at p.3). Defendants sent a letter to Plaintiff acknowledging the receipt of his request and informing him that he would be notified of the "date, time and location" of the hearing at a later date. However, on June 5, 2020, LSU sent Plaintiff another letter notifying him that his request for a UHP review was denied because "the time frame . . . to request a University Hearing Panel has expired." (Doc 3, Exhibits 1 and 2).

A.     **Suit and Preliminary Injunction**

On June 18, 2020, Plaintiff filed a Complaint against Defendants asserting violations under Title IX of the Education Amendments Act of 1972, 42 U.S.C. § 1983, and alleging Breach of Contract under Louisiana law. (Doc. 1). The same day,

Plaintiff also filed a Motion for Temporary Restraining Order and a Preliminary Injunction. Plaintiff alleges that throughout the investigation he was never given the "opportunity to make arguments to a panel of decision-makers, participate at a hearing, and prepare for and present a case, and cross-examine witnesses, or procure expert testimony." (Doc. 3 at p. 1). Plaintiff alleges that Defendants denied him the bare-minimum procedures outlined in LSU's policy and deprived him of a hearing or the ability to review evidence against him until after Defendants found him responsible. (Id.)

Plaintiff alleges three violations of school policy regarding the investigation process. First, Plaintiff asserts that, according to Defendants' Permanent Memorandum 73-Title IX and Sexual Misconduct Policy ("PM-73"), he should have been notified in writing as to the date, time, and location of the formal resolution process. Plaintiff claims he received no such notice. (Id. at p. 2). Plaintiff further claims that he only received notice after a formal resolution process had taken place and he was determined to be responsible for the alleged misconduct. (Id.).

Second, Plaintiff asserts that, according to the Defendants' policy, a Student Advocacy and Accountability Meeting is an informal administrative meeting in which a charged student is asked to share information about the incident before a determination of responsibility is made. Plaintiff claims that he attended the Student Advocacy and Accountability Meeting but was only asked questions concerning his character. Plaintiff claims that he was not given the opportunity to share any information or details about the incident. (Id. at p. 3). Soon after this meeting,

3

Defendants issued Plaintiff an outcome letter notifying him that LSU found him responsible for sexual misconduct.

Third, Plaintiff asserts that University policy allows a student to request a UHP review within three days of receipt of the outcome letter. Plaintiff received his outcome letter on May 1, 2020. Plaintiff claims that he did not understand the significance of the letter until May 8, 2020, and immediately sent notice of his request for a UHP review to Defendants on that day. (Doc. 3-1). Plaintiff claims that Defendants acknowledged the receipt of Plaintiff's request on May 12, 2020, and agreed to stay Plaintiff's suspension, and that LSU allowed him to enroll in an intersession course at the University pending the outcome of the UHP review. (Id.). Plaintiff alleges that on June 5, 2020, he was notified that Defendants had rejected his request because LSU deemed it to have been filed untimely. His suspension was then reinstated. (Doc. 3-2).

Plaintiff alleges that Defendants have unfairly blamed him for his failure to understand its "incomprehensible policies" and that, in contrast, Defendants have been in frequent contact with Jane Roe to specifically explain the disciplinary policies and procedures to her. (Id.). Plaintiff alleges that Jane Roe received preferential treatment from Defendants. He also alleges that Defendants have blatantly discriminated against him on the basis of sex and have deprived him of critical due process rights. Plaintiff claims that the Defendants' investigation and review procedures were unfair and rushed, and resulted in his suspension from the university, led to his removal from the football team, and caused the loss of his full

4

athletic scholarship. (Id. at p. 4). Plaintiff requests the Court to order Defendants to give Plaintiff a hearing before the UHP and lift the sanctions imposed on him pending the outcome of the UHP hearing.

In his pleadings and arguments, Plaintiff argues that his reputation and education are the liberty and property interests at stake in this litigation. Plaintiff also argues that the notice and opportunity to be heard during and after the investigation were deficient. Plaintiff further argues that his request for a UHP review was not untimely because Governor John Bel Edwards issued an Executive Proclamation, in response to the COVID-19 pandemic, that had the effect of extending the deadline for him to seek a hearing before the UHP to May 15, 2020.

Defendants dispute the applicability of the Governor's Proclamation to this matter and argue that Plaintiff was afforded sufficient due process because he was given notice and the opportunity to be heard at three different intervals during the investigation: the meeting with the Title IX investigator, the Title IX appeal stage, and the Student Advocacy and Accountability Meeting. Defendants argue that Plaintiff would have had an opportunity to be heard a fourth time–at the UHP review level –had he timely requested it. Defendants also argue that Plaintiff should not now be granted a UHP review because of concerns regarding the equal application of the university rules. In other words, to now accommodate the Plaintiff with a review by the UHP, despite his untimely request, would serve to afford Plaintiff a benefit to which other students are not entitled.

Moreover, Defendants assert that now that the Plaintiff has been suspended from LSU, granting the TRO will not return him to the status of a student in good standing at the University because the suspension has already taken place. In other words, his request that the Court order, through a TRO, that the status quo be maintained is actually a request for the Court to reverse the decisions of University officials, which is improper at this stage of the litigation.

At the conclusion of the evidentiary hearing in this matter, the parties were permitted to file post-hearing briefs that specifically addressed the applicability of the Governor's Proclamation and the possible irreparable injury to the Plaintiff. Plaintiff argues in the brief that the Governor's Proclamation extended the deadline for the UHP review beyond the three-day request period because as a state board, Defendants are subject to Section 5(H) of the Governor's Order, which requires the suspension of certain deadlines. (Doc. 25 at p. 2). Plaintiff further argues that Defendants had previously excused Plaintiff's late request for the UHP review on May 12, 2020, but Defendants improperly revoked the UHP review request nearly a month later. (Id. at p. 3).

Defendants argue in their brief that Section 5(H) of the Governor's Proclamation is inapplicable to this matter because the UHP review deadline is not a legal deadline required to be extended. They argue that is, instead, a non-essential deadline and that the Governor's Proclamation merely provided LSU with the flexibility to extend administrative deadlines if they deemed it necessary to do so. (Doc. 24 at p. 5). Defendants further argue that Plaintiff did not plead or produce

6

evidence that he actually relied on the Governor's Proclamation when he submitted his untimely request for the UHP review.

Regarding Plaintiff's claim of irreparable injury, he argues that if Defendants are not required to stay his suspension pending the outcome of the UHP review, he faces the injury of being irreversibly branded as a sexual predator and that a permanent gap will be featured on his academic record. (Doc. 24 at p. 4). Plaintiff further argues that the loss of his ability to play college football is another irreparable injury that may result from the unfair process and sanctions. Plaintiff asserts that had he received a proper disciplinary process and the ability to adequately defend himself, he would not have been suspended from the University and removed from the football team. (Id. at p. 5).

Defendants counter that Plaintiff has failed to establish a substantial threat of irreparable injury. They assert that "the notion of irreparable injury only refers to harm that might occur *pendente lite* if the preliminary injunction is not granted." (Doc. 24 at p. 2). Defendants argue that since Plaintiff has already been suspended, he now seeks to upset, not preserve, the status quo. (Id.). Defendants additionally note that Plaintiff has been suspended, not expelled; thus, he will not be permanently prevented from resuming his academic career after his suspension has concluded. Defendants assert that to the extent Plaintiff has a protected interest in pursuing higher education, then he has not been deprived of this right, it has only been delayed. (Id.). Defendants further assert that Plaintiff's argument that he will be harmed by

7

having to explain the gap in his academic record is too speculative to warrant injunctive relief. (Id. at p. 4).

## II.   LEGAL STANDARD

The party moving for a temporary restraining order must establish "(1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) (quoting *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998)). A temporary restraining order "is an extraordinary remedy [that] should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *PCI Transp., Inc. v. Fort Worth & Western R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). When Plaintiff fails to satisfactorily show one of the prerequisites for injunctive relief, the Court need not consider the remaining factors. See *Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990).

## III.   DISCUSSION

### A.   The Governor's Proclamations

Beginning in March 2020, Louisiana Governor John Bel Edwards issued a series of executive proclamations in response to the COVID-19 pandemic. Plaintiff submitted Proclamation Number 52 JBE 2020, issued in April 2020, in support of his

8

assertion that the three-day deadline imposed on May 1, 2020 was extended to May 15, 2020, by order of the Governor. Section 5(H) of the Proclamation, entitled "LEGAL AND ADMINISTRATIVE DEADLINES," expressly addressed the suspension of specific "[l]egal deadlines . . . applicable to legal proceedings in courts, administrative agencies and boards," until Friday, May 15, 2020. Section 5(H)(1) provides an illustrative list of statutes and regulations to which the suspension applies. The examples listed include, *inter alia*, the Louisiana Civil Code, Louisiana Code of Civil Procedure, Louisiana Code of Criminal Procedure, Louisiana Children's Code, Motor Vehicle and Traffic regulations, Revenue and Taxation statutes Wildlife and Fisheries statutes and several other titles of the Louisiana Revised Statutes. Section 5(H)(2) provides that "all other deadlines in *legal proceedings* in all courts, administrative agencies, and boards shall remain suspended until Friday, May 15, 2020." (emphasis added).

Section 5(I) of the Proclamation provides, "any state department or agency or political subdivision is hereby granted authority to further extend any non-essential deadline for a period of no longer than 30 days if deemed necessary to respond to the threat of COVID-19."  Defendants argue that to the extent the Governor's Proclamation applies to the disciplinary proceeding it conducted in this matter, Section 5(I) applied to such proceedings and must be interpreted as having provided LSU with the discretion to extend any non-essential deadline that it, the University, considers to be a "non-essential."

9

The applicability of Section 5(H) of the Proclamation to the disciplinary proceedings conducted by LSU turns on whether such a university disciplinary proceeding is a "legal proceeding." Although the parties did not specifically address the issue, the Court must conclude, at this stage of the proceedings, that the student disciplinary proceeding conducted here was not a legal proceeding that was subject to the Proclamation. Nothing in the record indicates that the disciplinary procedure featured sworn testimony, arguments by the parties or their representatives, the service of subpoenas or other discovery, an accurate recordation of the proceedings, a hearing officer, a legal analysis that supported the outcome or any other indicia of that which is commonly considered to be a legal proceeding. To be sure, the procedure conducted by LSU may have ultimately resulted in the initiation of legal proceedings, but no legal proceedings were conducted up to that point. As the United States Supreme Court has noted, "a school is an academic institution, not a courtroom or administrative hearing room." *Board of Curators of the University of Missouri v. Horowitz*, 435, U.S. 78,88 (1978).

Moreover, the plain language of Section 5(H) and the illustrative list of statutory and regulatory provisions included in it reveal that the Proclamation is applicable to legal proceedings conducted by courts in Louisiana and state agencies responsible for the enforcement of Louisiana statutes and regulations. In contrast, the student disciplinary process featured here appears to have been conducted not pursuant to Louisiana law but in conformity with guidance offered by the United States Department of Education and requirements under Title IX of the Education

Amendments of 1972, a federal statute to which the Proclamation by the state's governor does not seem to apply, especially when read in context with the specific state provisions listed in the Proclamation. Thus, the applicability of the Proclamation over the disciplinary proceedings is uncertain.

Because the UHP review deadline was not imposed as a part of a legal proceeding within the meaning of Section 5(H), the Court finds that the UHP review deadline was a non-essential deadline and that Defendants were entitled to extend it up to 30 days if they deemed it necessary to do so. Thus, the Court must conclude at this stage of the proceedings that Defendants were not in violation of the Proclamation by declining to extend the UHP review deadline beyond the three-day period.

### B.    Likelihood of Success on the Merits

The Court finds that Plaintiff has not demonstrated a substantial likelihood of success on the merits of his Title IX claim at this stage of the proceedings. This is not to say, however, that he may not ultimately prevail on the merits of his claim. However, he has not pleaded sufficient facts to lead the Court to conclude that he is likely to prevail.

Plaintiff asserts Title IX liability under the theories of selective enforcement and erroneous outcome. To succeed on a selective enforcement theory, Plaintiff must show that regardless of his guilt or innocence, the decision to initiate the disciplinary proceedings against him and/or the severity of his punishment was affected by his

11

gender. See *Klocke v. Univ. of Texas at Arlington,* 938 F.3d 204 (5th Cir. 2019). But here, Plaintiff has not pointed to any facts that persuade the Court that his gender was a motivating factor in Defendants' decision to suspend him. To succeed on the erroneous outcome theory, Plaintiff must show a causal connection between the flawed outcome and gender bias. *Klocke,* 938 F.3d at 210. Plaintiff attempts to establish the claim by alleging that Jane Roe received preferential treatment during the Title IX investigation. Yet Plaintiff has not pointed to any facts, other than his assertion that University officials met with her on several occasions, to convince the Court that a causal connection exists between the allegedly erroneous outcome of the Title IX investigation and Plaintiff's gender.

Also, Plaintiff has not demonstrated a substantial likelihood of success on the merits of his due process claim under 42 U.S.C. § 1983. Plaintiff alleges that he was not afforded notice and an opportunity to be heard; however, as Defendants have noted, Plaintiff was given notice of the claim against him and was provided three opportunities to participate in the disciplinary proceedings: (1) he participated in a meeting with the Title IX lead investigator, (2) he was advised of, and indeed invoked, his right to seek an appeal with the Title IX Coordinator, and (3) he was advised of his the opportunity to meet with the Student Advocacy and Accountability director, and indeed did so.

Courts assess due process in a university disciplinary proceeding by considering: (1) the student's interests that will be affected, (2) the risk of an erroneous deprivation of such interests through the procedures used and the probable

value of additional or substitute procedural safeguards, and (3) the university's interest, including the burden that additional procedures would entail. *Plummer v. Univ. of Houston,* 860 F.3d 767, 773 (5th Cir. 2017). Here, the Court finds that Plaintiff has established, as required by the first factor, that his interest will be affected by LSU's refusal to provide a UHP review. Currently, the Plaintiff is suspended from the University and cannot complete the degree requirements or return to the football team. His interests here cannot be disputed. However, the Court cannot conclude, at this stage, that Plaintiff was erroneously deprived of these interests by the procedure used by LSU. As noted, LSU asserts that Plaintiff was provided sufficient due process throughout the disciplinary procedures and that no additional safeguards were warranted. The Court agrees. The evidence presented thus far suggests that the notice LSU provided to Plaintiff, informing him of the allegations and providing him the opportunity to seek UHP review, was clear and unambiguous. Thus, the second factor weighs against Plaintiff. The third factor weighs in LSU's favor, as "the University has a strong interest in the educational process, including maintaining a safe learning environment for all its students, while preserving its limited resources." See *Doe v. Univ. of Mississippi,* 361 F.Supp.3d 597 (S.D. Miss. 2019), quoting *Doe v. Cummings,* 662 F.App'x 437, 466 (6th Cir. 2016). Thus, at this stage of the case, the Court cannot readily conclude that Plaintiff can demonstrate a due process violation.

The Court also finds that Plaintiff has failed to demonstrate a substantial likelihood of success on his breach of contract claim under Louisiana law. The State

13

of Louisiana has not waived its sovereign immunity to be sued for breach of contract in federal court and the State did not waive it in this matter. *See* La. R.S. 13:5106(A). The United States Court of Appeals for the Fifth Circuit has held that a breach of contract claim against LSU in federal court is barred by the Eleventh Amendment under La R.S. 13:5106(A). See *Raj v. Louisiana State University*, 714 F.3d 322, 329 (5th Cir. 2013).

### C. Irreparable Harm

A plaintiff seeking a preliminary injunction must show that irreparable injury will occur during the pendency of the litigation unless a preliminary injunction issues. *Justin Inds., Inc. v. Choctaw Secs., L.P.,* 920 F.2d 262, 268 (5th Cir. 1990). A harm is irreparable where there is no adequate remedy at law, such as monetary damages. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). A showing of a speculative injury is not sufficient; there must be more than an unfounded fear. *Id.* (citing *Carter v. Heard*, 593 F.2d 10,12 (5th Cir. 1979)).

Defendants cite *Pham v. Univ. of Louisiana at Monroe*, 194 F.Supp.3d 534, 548 (W.D. La. 2016), *aff'd sub nom. Dung Quoc Pham v. Blaylock*, 712 Fed.Appx 360 (5th Cir. 2017), in support of their contention that preservation of the status quo, technically speaking, will not assist the Plaintiff. In *Pham*, an expelled pharmacy student brought a lawsuit against his university for the failure to comply with due process before his expulsion. He also requested a preliminary injunction. The district court found that since plaintiff had already been expelled at the time he filed his suit,

14

there was "no threat of irreparable injury or reason to preserve the status quo because the status quo is not what is desired."

Plaintiff's preliminary injunctive relief request here includes a UHP review and the reinstatement of his status as a student and member of the football team. The purpose of a preliminary injunction is to preserve the status quo and prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. *Exhibitors Poster Exchange, Inc. v. National Screen Service Corp.*, 441 F.2d 560, 561 (5th Cir. 1971).

The Court finds that because Plaintiff had already been suspended when he filed suit, preservation of the status quo will not aid him. Moreover, because the Court has found the Governor's Proclamation to be inapplicable to Plaintiff's request for an extension of the UHP review deadline, the Plaintiff's status quo request is untimely. In fact, as the Defendants point out, the relief requested by Plaintiff would upset the status quo, not preserve it.

Regarding Plaintiff's allegations that a lapse in his education record, inability to play football, and possible branding as a sexual predator will result in irreparable harms, he offers rulings from several district courts and the United States Court of Appeals for the Sixth Circuit in support of his arguments. (Doc. 25 at p. 4).[2] Numerous

---

[2] *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *1 (S.D. Ind. 2014); *Marshall v. Ohio University*, No. 2:15-CV-775, 2015 WL 1179955, at *1 (S.D. Ohio 2015); *Doe v. University of Connecticut*, No. 3:20CV92 (MPS), 2020 WL 406356, at *1 (D. Conn. 2020); *Doe v. Pennsylvania State University*, 276 F.Supp.3d 300 (M.D. Pa. 2017); *Doe v. University of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017).

15

courts have found irreparable harm based on a suspension alone; whereas, other courts found irreparable harm when additional factors, specific to each plaintiff's situation, was considered.[3]

The Court notes that the Plaintiff has not pointed to, and the Court has not found, cases in which the Fifth Circuit has recognized that a suspension from a university is an irreparable harm. While the Court recognizes that Plaintiff's alleged harms carry potentially far-reaching and serious consequences, it must conclude at this stage of the litigation that such possible harms are far too speculative to constitute an irreparable harm that is likely to occur if injunctive relief is not granted. For instance, it is not certain that Plaintiff will be branded a sexual predator or that he will someday have to explain any gap in his educational career. Moreover, the assertion that Plaintiff's desired professional football career would be compromised if he must await a trial on the merits of his claim is entirely speculative. Because Plaintiff is suspended and not expelled, his education and football career are delayed but not irrevocably denied.

---

[3] In *Doe v. University of Connecticut*, the plaintiff had one semester remaining until graduation when he was suspended. The plaintiff had already begun to apply for jobs, so the court found that not granting injunctive relief to stay the two-year suspension would cause irreparable harm. In *Doe v. Pennsylvania State University*, the court found irreparable harm because the broad language of Plaintiff's sanction could extend the two-year suspension for many years beyond.

16

## IV. CONCLUSION

Accordingly, for the reasons provided herein,

**IT IS ORDERED** that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 3) is **DENIED**.

Baton Rouge, Louisiana, this 21st day of July, 2020

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**